UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | CR421-111-3 |
| | ) | |
| ADAM MATHIAS GARCIA, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Defendant Adam Mathias Garcia is indicted on one count of Conspiracy to Possess with Intent to Distribute and to Distribute Cocaine in violation of 21 U.S.C. § 846; one count of Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. § 841(a)(1); two counts of Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c); and two counts of Possession of a Firearm by a Prohibited Person in violation of 18 U.S.C. § 922(g)(1).  Doc. 3 at 2, 12-16 (Indictment).  He moves to suppress evidence obtained pursuant to a search warrant.  Doc. 309.  The Government responded in opposition, doc. 410, and the Court held a hearing, doc. 526 (Minute Entry).   For the following reasons, the motion should be **DENIED**.  Doc. 309.

# BACKGROUND

A Savannah Counter Narcotics ("CNT") agent obtained the challenged warrant from a judge of the Magistrate Court of Chatham County, Georgia (the "issuing magistrate"). Doc. 529-1 at 7-9. The warrant authorized law enforcement to search Garcia's residence at an address in Pooler, GA, his person, his wife's person, and his maroon Harley Davidson motorcycle for evidence of drug trafficking, illegal use of a communication facility, and possession of a firearm by a convicted felon. *Id*. The agent's affidavit in support of the warrant details an ongoing investigation into Garcia and his suspected involvement with a drug trafficking organization ("DTO"). *Id*. at 1-6.

The affidavit includes information obtained via surveillance, other law enforcement agencies, and "a confidential and reliable informant" called "CRI 14-95."[1]  *See* doc. 529-1 at 2. It relates the following facts.

---

[1] At the hearing, the CNT agent testified that CRI 14-95 was actually a series of wiretaps obtained pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Doc. 526 (Minute Entry). He explained that a judge of the Superior Court of Chatham County, Eastern Judicial Circuit of Georgia previously authorized law enforcement to refer to the wiretaps as an informant "for all relevant law enforcement purposes (i.e., search warrant affidavits . . .)", and to attribute human characteristics to CRI 14-95. *See, e.g.*, doc. 526-4 at 34. The record is silent as to whether the CNT agent informed the issuing magistrate that CRI 14-95 was actually a series of wiretaps. Accordingly, the Court assumes that she authorized the warrant understanding that CRI 14-95 was a human informant.

Drug Enforcement Administration ("DEA") agents observed Garcia attend a meeting at a "known cocaine distribution location" in Houston, and informed Chatham County agents that they believed Garcia would subsequently travel to Chatham County with narcotics on a black Harley Davidson motorcycle. *Id.* at 2. Using the motorcycle's license plate number provided by Houston DEA, the CNT agent conducted a license database search and determined that the Pooler address was Garcia's residence. *Id.* A DEA agent surveilled Garcia arriving at the Pooler address on the black Harley Davidson one day after the meeting in Houston. *Id.*

The day after Garcia returned to Chatham County, CNT agents obtained a warrant to search another suspected DTO member Raphael Smith's residence in Savannah. Doc. 529-1 at 2. They seized "a quarter kilogram of cocaine, large sums of currency, and firearms" while executing the search. *Id.* Agents also seized "a large sum of currency and narcotics evidence" from Smith's black Harley Davidson in his garage. *Id.* Additional investigation, including a review of Garcia and Smith's social media accounts, revealed that they were both members of the same motorcycle club. *Id.* Their social media posts included "an

extensive travel itinerary" showing that they traveled to Houston via motorcycle together before Garcia's meeting, and returned to Chatham County together. *Id.* The Bureau of Alcohol, Tobacco, and Firearms ("ATF") also informed the CNT agent that Garcia was previously convicted on felony charges for his involvement in the Atlanta chapter of the motorcycle club and trafficking cocaine. *Id.*

The affidavit notes that after Garcia's initial trip to Houston, CRI 14-95 indicated that he would travel to Ohio to visit his family, and then again to Houston to obtain multiple kilograms of cocaine. Doc. 529-1 at 2-3. CRI 14-95 also provided the CNT agent with a phone number Garcia was using to communicate with other suspected DTO members, and Verizon records showed that the number belonged to Garcia's wife. *Id.* at 3. CRI 14-95 subsequently confirmed that Garcia had met his family in Ohio, and was on his way to Houston to "obtain kilogram amounts of suspected cocaine." *Id.* at 3. CRI 14-95 indicated that Garcia would arrive in Houston on July 6, 2020, and meet with an individual the following day to "orchestrate the narcotics deal." *Id.* Garcia's social media posts confirmed that he was with his family in Ohio "on/around

July 4", and "later postings on/around July 9th indicat[ed] that [he] was now in Texas." *Id.*

The next week, CRI 14-95 indicated that Garcia had "[run] into complications" with his "normal source of supply" in Houston, and that he sought alternative sources in San Antonio and Dallas. Doc. 529-1 at 3. Garcia's social media posts confirmed that he traveled to Dallas "on[ ] or about July 14th, 2020". *Id.* On July 31, 2020, the source further indicated that Garcia traveled to Phoenix "where [he] had finalized a narcotics deal[.]" *Id.* Garcia's social media posts confirmed that he traveled to Phoenix, where he was meeting with his "associates." *Id.* CRI 14-95 revealed that while Garcia was in Phoenix, he "discussed the pricing of suspected kilograms of cocaine which [he] was intending to obtain", and that "another conspirator" would "transport large sums of money" to Garcia to "finalize the narcotics deal[.]" *Id.*

CRI 14-95, however, subsequently revealed that Garcia's "money courier . . . may have lost or misappropriated a large portion" of the money. Doc. 529-1 at 3. Therefore, Garcia instructed his wife to meet with "another member of the . . . conspiracy" at his Pooler address to "obtain and transport a large sum of money" to Garcia so that he could

5

"finalize the narcotics deal with the Phoenix . . . sources of supply." *Id.* However, those sources advised Garcia to "return home for a few days" and that they would contact Garcia when he needed to return out west for the supply of cocaine. *Id.* The CNT agent subsequently confirmed that Garcia returned to the Pooler address based on his social media posts. *Id.*

On August 5, 2020, the confidential source revealed that Garcia was contacted by a supplier in San Antonio, and would take his maroon Harley Davidson on a three-day trip to San Antonio with a companion for a cocaine resupply. Doc. 529-1 at 4. On August 10, 2020, CRI 14-95 confirmed that Garcia traveled to Houston to pick up the companion before they traveled to San Antonio. *Id.* Garcia was expected to return to his residence with the suspected narcotics August 11, 2020, the day the search warrant issued. *Id.*

The affidavit also explains that Garcia "has access to firearms, which [he] keeps on his person at various times." Doc. 529-1 at 4. CRI 14-95 detailed specific instances in which Garcia displayed or carried a firearm for protection against other motorcycle clubs. *Id.*

Agents executed the search warrant on August 16, 2020. Doc. 529-1 at 11-12. Items seized include suspected cocaine, other suspected drugs, firearms, ammunition, and currency. Garcia seeks to suppress the seized evidence, arguing the warrant application failed to establish probable cause that evidence of the alleged crimes would be found at his residence. *See generally* doc. 309. Specifically, he contends that CRI 14-95 was "a career paid informant whose sole interest is to get paid", and that more corroboration is needed than "a travel log of [Garcia's] travels merely verified in social media posts[.]" *See id.* at 1, 4.

## ANALYSIS

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In some cases, evidence seized pursuant to a search warrant that is not supported by probable cause is suppressed, or excluded, from the trial of a case. *United States v. Welch*, 2011 WL 3911113, at * 4 (S.D. Ga. Aug. 18, 2011). "Search warrants are presumed to be validly issued." *See United States v. Bushay*, 859 F. Supp. 2d 1335, 1377 (N.D. Ga. 2012) (citing *Franks v. Delaware*, 438 U.S. 154,

171 (1978)). A defendant seeking suppression of evidence seized during a search conducted pursuant to a warrant has the burden of establishing that the warrant was defective. *Id.* (citing *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. 1981); and *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980)).

The Supreme Court has established that, in evaluating the sufficiency of an issuing magistrate's determination of probable cause, "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (quotations and citations omitted). In considering whether the affiant's proffer and issuing judge's acceptance of the existence of probable cause are adequate, the standard for review is "exceedingly deferential." *See United States v. Rangel*, 2018 WL 817845, at * 6 (S.D. Ga. Jan. 18, 2018); *see also United States v. Leon*, 468 U.S. 897, 914 (1984) ("Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's

determination." (citations omitted)). In even "doubtful or marginal cases," the probable cause determination should be upheld. *Rangel*, 2018 WL 817845, at * 6 (quoting *United States v. Scott*, 555 F.2d 522, 527 (5th Cir. 1977)). Probable cause, itself, requires neither convincing proof nor an actual showing of criminality; only a "substantial chance" of such activity is required. *See Gates*, 462 U.S. at 243 n.13. The Eleventh Circuit has explained that for an affidavit to support a probable cause finding, it "should establish a connection between the defendant and the [place] to be searched and a link between the [place] and any criminal activity." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002).

Where, as here, an affidavit mentions information obtained from an informant, the Court must consider the informant's "veracity," "reliability" and "basis of knowledge" as relevant factors in its "substantial basis" analysis. *United States v. Brown*, 2021 WL 2982311, at *4 (S.D. Ga. Apr. 2, 2021). "These factors are to be 'understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of

reliability.'" *United States v. Bronner*, 2020 WL 3491965, at *25 (M.D. Fla. May 18, 2020) (quoting *Gates*, 462 U.S. at 233). The Eleventh Circuit has also explained that "corroboration of the details of an informant's tip by independent police work is of significant value [in the probable cause analysis], particularly in the context of an anonymous informant." *United States v. Gonzalez*, 969 F.2d 999, 1003 (11th Cir. 1992).

Garcia argues that the affidavit was based "solely"[2] on tips from CRI 14-95, "a career paid informant", and that they are insufficiently corroborated to establish CRI 14-95's credibility. *See, e.g.*, doc. 309 at 1-2. Specifically, he contends that his social media posts merely confirm the *non-criminal aspects* of CRI 14-95's tips, *i.e.*, Garcia's travel itinerary. *Id.* at 1-2. He argues that absent any information corroborating the tips regarding the alleged *criminal activity* at the destinations, the affidavit does not support a probable cause finding. *See, e.g., id.* at 6-7.

---

[2] As discussed above, the affidavit is not based solely on information from CRI 14-95. It also details, *e.g.*, surveillance from various law enforcement agencies, license plate database search results, ATF information regarding Garcia's prior convictions and motorcycle club affiliation, and the execution of a search warrant at a fellow club member's residence. *See generally* doc. 529-1 at 2-5; *see also* doc. 309 at 3 (Garcia's motion later states that "[t]he *majority* of the affidavit relies *heavily* on the informants' statements about [Garcia's] travel verified by social media." (emphasis added)).

10

The affidavit's description of CRI 14-95's past performance as an informant significantly bolsters CRI 14-95's credibility:

> CRI 14-95 is not a convicted felon, is not on probation or parole, has no pending charges, and is receiving monetary compensation. CRI 14-95 has provided information in over seven investigations, leading to over a dozen felony arrests and convictions [related to cocaine, marijuana, heroin, and firearms].

Doc. 529-1 at 4; *United States v. Griffin*, 2010 WL 1726901, at *2 (S.D. Ga. Apr. 8, 2010) (issuing magistrate has a sufficient basis for crediting informant when affidavit indicates that the informant "had provided reliable information in the past that had led to numerous arrests and convictions of individuals on firearms and drug charges."); *see also* Wayne R. LaFave, 2 Search & Seizure § 3.3(b) (6th ed. 2021) ("Lower courts have with virtual unanimity held that a declaration that the informant's past information has led to convictions is a sufficient showing of the informer's credibility.").

Further, although Garcia is correct that his social media posts do not corroborate the criminal aspects of CRI 14-95's tips, it is well-established that "at least partial corroboration of even innocent details of a tip can be sufficient to establish probable cause." *United States v. Wilson*, 2020 WL 638690, at *4 (N.D. Ga. Feb. 7, 2020); *see also Gates*,

11

462 U.S. at 243 n. 13 ("the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts."). As the Supreme Court has explained, "[b]ecause only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities." *Alabama v. White*, 496 U.S. 325, 332 (1990).

Here, CRI 14-95 accurately predicted the dates of Garcia's arrival in and departure from Ohio, Houston, Dallas, Phoenix, and Chatham County. *See generally* doc. 529-1 at 2-5. This corroborated "peculiar travel . . . became suspicious in light of the initial tip[s]" that Garcia's trips to most of these cities were related to his attempts to obtain narcotics resupplies. *United States v. Stearn*, 597 F.3d 540, 556 (3d Cir. 2010) (quoting *Gates*, 462 U.S. at 233 n.13. (internal quotations omitted)); *see also United States v. Edwards*, 2016 WL 918044, at *4 (W.D. Mo. Mar. 8, 2016) ("An informant may also prove himself to be a reliable source for law enforcement by providing predictive information about a meeting time or place."). This significant corroboration also compensates for the

affidavit's failure to disclose the basis of CRI 14-95's knowledge. *See United States v. Carswell*, 996 F.3d 785, 792 (7th Cir. 2021) (finding investigators' "substantial corroboration" to "pose[ ] the biggest obstacle for [Defendant's] challenge to the search warrant."). The affidavit further strengthens CRI 14-95's credibility by explaining that that the cell number Garcia used to communicate regarding the alleged narcotics conspiracy was confirmed by Verizon records to be owned by his wife. Doc. 529-1 at 3; *see United States v. Higareda*, 2020 WL 7777988, at *4 (E.D. Ky. Dec. 31, 2020) (law enforcement corroboration of phone number ownership tip strengthens informant credibility).

Considering the facts establishing the informant's credibility, the affidavit also provided sufficient facts for the issuing magistrate to find probable cause that evidence of the alleged crimes would be found at Garcia's residence. An application for a warrant to search a residence "need not . . . [allege] that the illegal activity occurred at the location," *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009); however, it "should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *United States v. Mitchell*, 503 F. App'x 751, 754 (11th

13

Cir. 2013) (citing *Martin*, 297 F.3d at 1314). The burden of establishing a link between the defendant's residence and alleged criminal activity is low because, as Eleventh Circuit has explained, "few places are more convenient than one's residence for use in planning and hiding fruits of a crime." *Kapordelis*, 569 F.3d at 1310 (quoting *United States v. Green*, 634 F.2d 222, 226 (5th Cir. 1981)).

The affidavit connects Garcia to alleged cocaine trafficking by noting that DEA agents correctly predicted that he would return to Chatham County on a black Harley Davidson after observing him at a "known cocaine distribution location" in Houston. Doc. 529-1 at 2. Social media posts confirm that he made the trip to Houston with Defendant Raphael Smith, a member of the same motorcycle club, and law enforcement seized "a quarter kilogram of cocaine" and large sums of currency from Smith's Savannah residence the day after the pair returned to Chatham County. *Id.* The affidavit also explains that the CNT agent learned that Garcia was previously convicted on felony charges for his involvement in the Atlanta chapter of the same motorcycle club, including trafficking cocaine. *Id.* These connections are bolstered by the extensive detail from CRI 14-95 regarding Garcia's cross-country

14

cocaine-resupply-related travel, discussed above. *See generally id.* at 2-5.

The affidavit connects Garcia to the residence by explaining that it is associated with his black motorcycle's license plate number in a law enforcement database. Doc. 529-1 at 2. The affidavit also supplied the issuing judge with a substantial basis to conclude that Garcia "might keep evidence of his crimes at his home[.]" *Kapordelis*, 569 F.3d at 1310. For example, it notes that Garcia returned to the residence the day after the DEA observed him at a "known cocaine distribution location" in Houston. *Id.* at 2. It also states that he instructed his wife to meet with "another member of the . . . conspiracy" at the residence to "obtain and transport a large sum of money" to him so he could complete a narcotics transaction. *Id.* at 3.

The affidavit also establishes probable cause that evidence of possession of a firearm by a convicted felon would be found on Garcia's person. It notes that the CNT agent knew Garcia was previously convicted on felony charges for cocaine trafficking and details specific instances in which Garcia displayed or carried a firearm for protection against other motorcycle clubs. Doc. 529-1 at 4. It also establishes

probable cause that evidence of illegal use of a communication facility would be found on his person by noting that Garcia had been in phone contact with his wife regarding his resupply trips. *Id.* Finally, it establishes probable cause that evidence of the alleged crimes would be found in his maroon Harley Davidson motorcycle, since the agent confirmed Garcia owned the motorcycle, and he used it to travel on his suspected resupply trips. *See* doc. 529-1 at 2-5.

Even if the issuing magistrate did not have a substantial basis for finding probable cause, the Government contends that the good faith exception developed in *Leon*, 468 U.S. at 913, applies to the search warrant. Doc. 410 at 11-14. In *Leon*, the Supreme Court held that officers' objectively reasonable reliance on a warrant removed any practical justification for applying the exclusionary rule. *See* 468 U.S. at 921 (excluding evidence because the executing officer reasonably relied on the issuing magistrate's probable cause determination, "cannot logically contribute to the deterrence of Fourth Amendment violations."). Given that exception, "searches conducted pursuant to warrants will rarely require suppression." *United States v. Taxacher*, 902 F.2d 867, 871 (11th Cir. 1990). The Government bears the burden of showing the

applicability of the *Leon* good faith exception. *United States v. Robinson*, 336 F.3d 1293, 1297 (11th Cir. 2003).

*Leon* identified four situations where suppression would remain appropriate: (1) where the officer misled the issuing magistrate by intentionally or recklessly including false information in the affidavit, (2) "where the issuing magistrate wholly abandoned his judicial role" by failing to act neutrally, (3) where the "affidavit so lack[s] ... indicia of probable cause as to render official belief in its existence entirely unreasonable," and (4) where the warrant issued is "so facially deficient ... that the executing officers cannot reasonably presume it to be valid." 486 U.S. at 923. Although the Defendant's brief does not specifically address *Leon*, it does not appear to contain any suggestion that the officer intentionally or recklessly misled the magistrate, or that the magistrate "wholly abandoned his judicial role." *See generally* doc. 309. Considering the analysis of probable cause above, the affidavit cannot be said to lack probable cause "as to render official belief in its existence entirely unreasonable," and there is nothing identified that makes the warrant "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." 486 U.S. at 923. Therefore, the good faith

exception should apply, and suppression should be denied on those grounds, too.

## CONCLUSION

For the foregoing reasons, Garcia's Motion to Suppress should be **DENIED**. Doc. 309. This report and recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*,

648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED**, this 28th day of June, 2022.

_____
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA